United States District Court
Southern District of Texas
**ENTERED**
August 13, 2026
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RENE BARAHONA-RAMOS, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-25-4781 |
| | § | |
| ERIC GUERRERO, | § | |
| | § | |
| Respondent. | § | |

# MEMORANDUM OPINION AND ORDER

This case is before the Court on Petitioner Rene Barahona-Ramos's petition for a writ of habeas corpus and Respondent Eric Guerrero's Answer. Having carefully considered the petition, the answer, all the arguments and authorities submitted by the parties, and the relevant record, the Court is of the opinion that Barahona-Ramos's petition should be denied.

## I. Background

The Petitioner was charged by indictment with aggravated sexual assault of a child younger than six years of age. The indictment alleged that "on or about February 1, 2018," Barahona-Ramos "unlawfully, intentionally and knowingly cause[d] the penetration of the sexual organ of [Nancy], a child younger than six years of age" with his finger. Barahona-Ramos pleaded not guilty. Texas's First Court of Appeals summarized the relevant background1, and these facts are not in dispute:

---

[1]The Court of Appeals used pseudonyms for the complainant, her mother, and her siblings. This opinion uses the names used by the Court of Appeals.

Following a hearing outside the presence of the jury, the trial court held that the complainant's mother, Sarah, could testify as an outcry witness. Sarah testified at trial that she met Barahona-Ramos in 2014 and they began dating. About six months later, Barahona-Ramos moved in with Sarah and her children Nancy, Nancy's twin sister Lisa, and Nancy's older brothers Jack and Bobby. Nancy and Lisa were about one year old when Barahona-Ramos moved in. They believed that Barahona-Ramos was their biological father and they called him "Papi."

On February 23, 2018, Sarah was working, and Barahona-Ramos was at home alone with the children. Barahona-Ramos called Sarah at work through a video call. According to Sarah, Barahona-Ramos, Nancy, and her twin sister were in bed together. While Sarah found that odd, she did not think much of it. During the video call, Nancy told Sarah that "Papi did like this to my foo-foo" and she stuck out her tongue. The call suddenly dropped. Sarah thought the phone call was "awkward," but she did not follow up with Nancy or ask her questions about her statement.

The following month, Sarah went out with a friend and did not return home until around 4:00 a.m. on Sunday. Barahona-Ramos was angry with Sarah for staying out so late and he asked Sarah's son, Jack, to call the police to report her for leaving the children home alone. Jack was eight years old and Bobby was seven. According to Sarah, it was common for her and Barahona-Ramos to go out and leave Jack and Bobby in charge of their younger siblings. She thought it was "ridiculous" that Barahona-Ramos had her son report her to the police. Sarah denied being angry with Barahona-Ramos and testified she did not know her son had called the

police until the next morning when she got home.

When Sarah arrived home at around 4:00 a.m. on Sunday, March 11, 2018, Barahona-Ramos was waiting for her outside with a machete. According to Sarah, Barahona-Ramos broke her phone, yelled at her friend, and threatened her friend and her friend's husband. Barahona-Ramos would not let Sarah into the house, so she slept in her car until her children woke up and unlocked the door.

That morning, Sarah asked Nancy and Lisa how they felt about Barahona-Ramos because she was "trying to kind of weigh the odds of staying in the relationship or not" and she thought the girls "would be more affected by the separation" than their other siblings. Lisa told Sarah that she loved Barahona-Ramos because he gave her money for popcorn and pickles. Nancy, however, yelled that she hated Barahona-Ramos because he "used his mouth on her" vaginal area, which she referred to as her "foo-foo," and he "put his fingers and was digging in her foo-foo." According to Sarah, Nancy was upset and "just hyper to get her words out." Sarah, who was enraged and disgusted by Nancy's claims, grabbed a knife and confronted Barahona-Ramos who told her she was crazy. He yelled at Nancy and called her a liar. Sarah called the police later that evening because she did not want Barahona-Ramos in the home when she went to sleep that night.

When the police arrived at Sarah's house, they removed Barahona-Ramos and took statements from Sarah and Nancy. Officer Ricardo Rivera with the Houston Police Department took a statement from Sarah, and he spoke to Nancy. The following day, Sarah took Nancy to Texas Children's Hospital for a sexual assault examination. Although the hospital referred

Nancy to the Child Assessment Center ("CAC"), Sarah did not take Nancy to the CAC for a forensic interview until November 2018.

Evidence shows that Nancy made a prior allegation of abuse against her brother Bobby. Child Protective Services investigated the allegation, and the final disposition of the investigation was "ruled out." Defense counsel attempted to elicit testimony from Sarah concerning Nancy's prior allegation against Bobby in 2017, as well as Sarah's statements to Officer Rivera on March 11, 2018, to establish that Sarah had doubts about Nancy's allegations of abuse against Barahona-Ramos.

During cross-examination, Sarah testified that she spoke to several officers the night she reported the abuse involving Barahona-Ramos. She testified:

> Defense: Now do you remember telling -- and I think the State asked you about this -- that you kept telling [Officer Rivera] you weren't sure if this happened?
>
> Sarah: Yeah.
>
> Defense: Because at that time you weren't sure if this happened, correct?
>
> Sarah: I didn't want to believe it.
>
> Defense: Okay. Well, why else did you think it hadn't happened? Why did you say that to [Officer Rivera]?
>
> Sarah: Why did I say what? I'm sorry.
>
> Defense: I'm not sure if this happened.

2 Reporter's Record (Docket Entry No. 11-9) at 279.

Defense counsel questioned Sarah about the February 2017 CPS investigation and she

inquired whether Sarah doubted Nancy's allegation of sexual assault against Barahona-Ramos. The trial court sustained an objection to the relevance of the question, but allowed counsel to ask Sarah if she believed Nancy's accusation. Sarah responded: "I wanted to believe that it was not true." Counsel then asked whether Sarah had doubts based on Nancy's prior accusation against Bobby, but the trial court sustained objections to the line of questioning.

Houston Police Officer Ricardo Rivera was dispatched to Sarah's house on March 11, 2018. Although no one answered when he knocked on the door, Officer Rivera saw some small children come to the window and he heard an adult male and an adult female arguing inside. Sarah opened the door ten to fifteen minutes later. Officer Rivera observed that Sarah was "very frantic" and crying, and he learned that Barahona-Ramos was still in the living room.

Officer Rivera spoke to Sarah, and he briefly spoke to Nancy. After speaking to Nancy, Officer Rivera determined that an allegation of sexual assault had been made against Barahona-Ramos and he contacted the Harris County District Attorney's Office and CPS. Barahona-Ramos was arrested later that evening and charged with aggravated sexual assault of child younger than six years old.

On cross-examination, defense counsel asked Officer Rivera if Sarah had told him "she wasn't sure if [Nancy's sexual assault allegations against Barahona-Ramos] happened." Officer Rivera testified that he "believe[d] she said that."

Detective Ernest Slaughter was the HPD Child Sex Crimes investigator assigned to the case. When he arrived at Sarah's house, Slaughter spoke to Rivera, who informed him that Nancy had made an outcry of abuse to Sarah. As part of his investigation, Slaughter made

several appointments for Sarah to take Nancy to the CAC for a forensic interview, but Sarah did not take Nancy to the CAC until November 2018.

Slaughter reviewed Nancy's forensic interview, a CPS report concerning this case, medical records from Nancy's sexual assault examination, and he spoke to Sarah and other witnesses in the case. He concluded that Nancy's allegations were consistent with respect to the details of Barahona-Ramos' sexual abuse.

On cross-examination, Slaughter testified that he obtained two CPS reports involving Nancy. Defense counsel then asked him a series of hypothetical questions regarding the existence of inconsistencies between the CPS records and statements made during the CAC forensic interviews. Slaughter testified that he did not notice any inconsistencies in the records he reviewed in this case, but if he had "seen inconsistencies like the ones [he was asked about on cross-examination he] would have done something differently."

After the State rested its case, Barahona-Ramos recalled Slaughter. Slaughter testified that he reviewed two CPS reports involving Nancy, both of which were "initiated on behalf of the family." One report involved Nancy's March 2018 allegations of sexual assault against Barahona-Ramos, and the other was a report from February 2017 involving Nancy and her brother Bobby. Slaughter testified there were inconsistencies in Nancy's statements between the February 2017 CPS report and her November 2018 forensic interview. On cross-examination, the State asked Slaughter if Nancy had been consistent in claiming that Barahona-Ramos had "put his fingers in her vagina," and he testified that Nancy's statements were consistent on that point.

Nancy, then nine years old, testified at trial. She testified that, one morning when she was five years old, Barahona-Ramos took her to his room. Barahona-Ramos told her to lay down on the bed and he then pulled her pants down. Nancy testified that she felt Barahona-Ramos' fingers in her vagina, and it felt "uncomfortable." Barahona-Ramos stopped touching Nancy when Sarah called from work. Nancy tried to tell Sarah what had happened but she "couldn't tell her because [Barahona-Ramos] was talking to her." Nancy eventually told Sarah what Barahona-Ramos had done to her and afterwards, the police came to her house. According to Nancy, she felt "safer" when the police arrived because Barahona-Ramos "was going to be gone."

After the State concluded its direct examination of Nancy, Barahona-Ramos asked the court to conduct an in camera hearing pursuant to Texas Rule of Evidence 412(c). During the hearing, Nancy testified that she also referred to her vagina as her "foo-foo." Nancy did not remember ever telling anyone that her brother Bobby had touched her foo-foo and her butt. According to Nancy, Bobby "never touched me." After Nancy was excused, Barahona-Ramos argued that Nancy's statement about Bobby was inconsistent with CPS records and that Sarah testified that she didn't believe Nancy when she accused Barahona-Ramos because she had made up those allegations against her brother. Counsel argued that Sarah's skepticism was confirmed by Nancy's own testimony. She sought leave to cross examine Nancy about those false allegations that she made against her brother. At the conclusion of the in camera hearing, the trial court ruled that counsel would be allowed limited inquiry on this topic.

On cross-examination, Barahona-Ramos questioned Nancy about her prior allegations

against her brother Bobby. She denied that he had ever touched her inappropriately.

In closing, Barahona-Ramos' counsel discussed the February 2017 CPS investigation involving Bobby, and she identified discrepancies in the evidence that, she argued, undermined Sarah's credibility, including Sarah's alleged inconsistent testimony about her statements to Officer Rivera the night Barahona-Ramos was arrested.

She argued that Nancy had falsely accused Barahona-Ramos of sexually assaulting her because he had reported Sarah to the police the night before and she was unhappy about it. Defense counsel argued that Nancy did not expect things to "blow up" after she accused Barahona-Ramos of abuse because she had made a similar allegation against her brother and nothing came of CPS's investigation into that claim. According to defense counsel, Nancy's "life [was] turned upside down" after she made her claims against Barahona-Ramos, and she could not "take that back," so she continued to repeat the lie.

The jury found Barahona-Ramos guilty of the first-degree felony offense of aggravated sexual assault of a child younger than six years old and the trial court assessed his punishment at twenty-five years' confinement. See Barahona-Ramos v. State, No. 01-23-00096-CR, 2024 WL 2965238, at *1–10 (Tex. App. June 13, 2024), petition for discretionary review refused (Oct. 23, 2024).

## II. Applicable Legal Standards

This federal petition for habeas relief is governed by the applicable provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). See Lindh v. Murphy, 521 U.S. 320, 335-36 (1997). Under the AEDPA federal habeas relief based upon claims that were

adjudicated on the merits cannot be granted unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Kitchens v. Johnson, 190 F.3d 698, 700 (5th Cir. 1999).

The AEDPA precludes federal habeas relief on factual issues unless the state court's adjudication of the merits was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See 28 U.S.C. § 2254(d)(2); Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000). The state court's factual determinations are presumed correct unless rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see also Jackson v. Anderson, 112 F.3d 823, 824-25 (5th Cir. 1997).

## III. Analysis

Barahona-Ramos contends that the trial court's refusal to allow him to cross examine Sarah about Nancy's previous allegations of sexual abuse by her brother violated his Sixth Amendment right to confront adverse witnesses, and his Fourteenth Amendment right to due process.

### A. Confrontation Clause

The Sixth Amendment states, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . .." The Supreme Court has noted that "the main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." Delaware v. Van Arsdall, 475 U.S. 673, 678,

(1986)(internal quotation marks and citation omitted). The Court continued:

> It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. And . . . the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.

Id. at 679 (internal quotation marks and citation omitted). Even if the limitation on cross examination was improper, any error is subject to harmless error analysis. On federal habeas review, an error is harmless unless it "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

At trial, defense counsel tried to question Sarah about a previous accusation Nancy made that her brother touched her inappropriately. The trial judge sustained several objections and counsel was only able to get Sarah to acknowledge that she was concerned about whether the incident with Barahona-Ramos really happened.

In response to questioning by defense counsel, Detective Slaughter acknowledged that there were inconsistencies between the CPS report concerning Nancy's allegations about her brother and a subsequent forensic interview on the same subject. In response to questioning by the prosecution, he stated that there were no inconsistencies in her statements about Barahona-Ramos.

In closing argument, defense counsel pointed out inconsistencies between Sarah's trial

testimony and her statements to police on the night of the incident with Barahona-Ramos.

The Texas Court of Appeals rejected this claim.

> Detective Slaughter testified that he reviewed two CPS reports during his investigation, both of which involved allegations of sexual assault made by Nancy. One report addressed Nancy's allegation of sexual assault against Barahona-Ramos in March 2018, and the other concerned a February 2017 report "regarding [Nancy] and her brother, [Bobby]." Nancy, who was five years old in March 2018, was questioned about the February report. She testified that she did not remember telling anyone when she was four years old that Bobby had touched her butt and foo-foo." When asked if Bobby had gotten in trouble for touching her butt and "foo-foo," Nancy testified, "I don't remember. He never touched me."
>
> Defense counsel was also able to ask Sarah some questions about Nancy's prior allegations of sexual abuse against Barahona-Ramos. While she did not recall using the word "doubt," Sarah testified that she told the officers investigating Nancy's allegations against Barahona Ramos that she was not "sure if this happened."
>
> Although Sarah did not testify that she doubted Nancy's allegations against Barahona-Ramos because Nancy had previously made an outcry of sexual abuse against her brother Bobby, Barahona Ramos was able to elicit testimony that Nancy had accused Bobby of sexually assaulting her by touching her butt and "foo-foo," and that the allegation was purportedly false because, as Nancy testified at trial, Bobby "never touched" her. Sarah also testified that she had questioned whether Nancy was being truthful when she claimed that Barahona-Ramos had sexually assaulted her. And Barahona-Ramos was able to elicit other arguably conflicting testimony from Sarah regarding her statements to Officer Rivera and the prosecution, which he used during his closing argument to argue that Sarah was not a credible witness. In his closing, Barahona-Ramos argued that Nancy falsely accused him of sexually assaulting her because he had Sarah reported to the police for child abandonment the night before and Nancy was unhappy about it.
>
> Because Barahona-Ramos was able to present his fabrication

> defense to the jury, the trial court's exclusion of evidence during Sarah's cross-examination constitutes non-constitutional error. See Potier v. State, 68 S.W.3d 657, 665 (Tex. Crim. App. 2002) . . . . We further conclude that Barahona-Ramos was not harmed by the exclusion of this evidence because he was able to introduce similar evidence elsewhere at trial. Barahona-Ramos introduced evidence that Nancy had accused her brother Bobby in February 2017 of touching her butt and "foo-foo," that CPS had investigated the allegations and nothing had come of them, and that in light of Nancy's prior allegations, Sarah questioned whether Nancy was being truthful when she accused Barahona-Ramos of sexually assaulting her in the same manner. Barahona-Ramos was also able to question Nancy about the 2017 allegations, and he elicited testimony from Nancy . . . that Bobby had not touched her. . . .
>
> In light of this testimony, we cannot say that Barahona-Ramos'[s] inability to cross-examine Sarah with evidence that Nancy "had made false allegations of sexual abuse in the past causing [Sarah] to doubt the allegations in this case," had such a substantial and injurious effect or influence" on the jury's guilty verdict."

Barahona-Ramos, slip op. at 38-41; Docket Entry No. 11-2 at 38-41.

Because Barahona-Ramos was able to introduce evidence of Nancy's prior allegation against her brother, and that CPS determined that the allegation was baseless, his inability to introduce the same information through cross-examination of Sarah is, at most, harmless error. The state court's conclusion is reasonable, and is entitled to deference from this Court.

**B. Due Process**

Barahona-Ramos also argues that the trial court's refusal to allow him to cross examine Sarah about Nancy's previous accusation against her brother denied him due process.

> Due process is implicated only for rulings of such a magnitude or so egregious that they render the trial fundamentally unfair. It offers no authority to federal habeas courts to review the mine run of evidentiary rulings of state trial courts. Relief will be warranted only when the challenged evidence played a crucial, critical, and

highly significant role in the trial.

Gonzales v. Thaler, 643 F.3d 425, 430 (5th Cir. 2011)(internal quotation marks and citations omitted).

As noted above, while Barahona-Ramos was prevented from pursuing a specific line of questioning, he was still able to get the information to the jury that Nancy made a prior accusation against her brother, and that CPS determined the accusation was baseless. Therefore, the trial court's ruling, even if it was error, did not render the trial fundamentally unfair.

## IV. Certificate of Appealability

Barahona-Ramos has not requested a certificate of appealability ("COA"), but this Court may determine whether he is entitled to this relief in light of the foregoing rulings. See Alexander v. Johnson, 211 F.3d 895, 898 (5th Cir. 2000) ("It is perfectly lawful for district court's [sic] to deny COA sua sponte. The statute does not require that a petitioner move for a COA; it merely states that an appeal may not be taken without a certificate of appealability having been issued.") A petitioner may obtain a COA either from the district court or an appellate court, but an appellate court will not consider a petitioner's request for a COA until the district court has denied such a request. See Whitehead v. Johnson, 157 F.3d 384, 388 (5th Cir. 1988); see also Hill v. Johnson, 114 F.3d 78, 82 (5th Cir. 1997) ("[T]he district court should continue to review COA requests before the court of appeals does."). "A plain reading of the AEDPA compels the conclusion that COAs are granted on an issue-by-issue basis, thereby limiting appellate review to those issues alone." Lackey v. Johnson, 116 F.3d 149, 151 (5th Cir. 1997).

A COA may issue only if the petitioner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); see also United States v. Kimler, 150 F.3d 429, 431 (5th Cir. 1998). A petitioner "makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further." Hernandez v. Johnson, 213 F.3d 243, 248 (5th Cir. 2000). The Supreme Court has stated that:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. The issue becomes somewhat more complicated where . . . . the district court denies a habeas petition on procedural grounds. We hold as follows: When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

Slack v. McDaniel, 529 U.S. 473, 484 (2000).

This Court has carefully considered Barahona-Ramos's petition. The Court finds that reasonable jurists would not find it debatable that Barahona-Ramos's claims are without merit. Barahona-Ramos thus fails to make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Court therefore concludes that Barahona-Ramos is not entitled to a certificate of appealability.

## V. Conclusion and Order

For the foregoing reasons, the Petition is **DENIED** and this action will be dismissed with prejudice. No certificate of appealability shall issue.

The Clerk shall notify all parties and provide them with a true copy of this Order.

**SIGNED** at Houston, Texas, on this the 13th day of August, 2026.

SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE